THE STATE OF OHIO, APPELLEE, *v.* SPIRKO, APPELLANT.

[Cite as State *v.* Spirko (1991), 59 Ohio St. 3d 1.]

(No. 89-722—Submitted October 23, 1990—Decided April 10, 1991.)

4

*Charles F. Kennedy III,* prosecuting attorney, and *Charles Koch,* for appellee.

*Randall M. Dana,* public defender, *Richard J. Vickers, Nathan A. Ray* and *George Rice,* for appellant.

SWEENEY, J. Pursuant to R.C. 2929.05(A),this court is duty-bound to undertake a three-prong analysis in reviewing the instant death penalty case. First, we will consider the specific issues raised by defendant with respect to the proceedings below. We will review all of defendant's propositions of law, even though some may be deemed to have been waived since they were not raised below. Second, we will independently weigh the aggravating circumstances in this case against any and all factors which mitigate against the imposition of the death sentence. Third, we will independently consider whether defendant's sentence is disproportionate to the penalty imposed in similar cases.

In his first proposition of law, defendant contends that evidence of polygraph examinations was improperly introduced during the course of the trial, and that the lack of a curative instruction by the court to the jury violated his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and Sections 2, 9, 10 and 16, Article I, and Section 26, Article II of the Ohio Constitution. It is defendant's contention that the trial court failed to follow the procedure for the admission of results of polygraph examinations established in *State* v. *Souel* (1978), 53 Ohio St. 2d 123, 7 O.O. 3d 207, 372 N.E. 2d 1318.

The first instance defendant points to occurred during the defense's cross-examination of postal inspector Cline, a state's witness, who stated, without comment by defense counsel, that during the course of his investigation he asked defendant if he would be willing to submit to a polygraph examination.[1]

[1] The exchange between postal inspector Cline and defense counsel of which defendant complains, was as follows:

"Q Did you tape record the conference?
"A No, Sir.

However, we believe that a careful review of the record reveals that no results of any polygraph examination were admitted during trial, and that at no time did the state with respect to this witness introduce or attempt to introduce any information about or reference to a polygraph examination of defendant.

In our view, Cline's statement was not prejudicial to defendant because Cline was merely responding to defense counsel's question concerning the nature of his conversation with defendant. Inasmuch as no results of any polygraph examination of defendant were proffered or admitted dur-

ing trial, the standards of *Souel* were not applicable in this instance.

The second instance cited by defendant occurred during the direct testimony of state's witness Andre Ruffin, who stated that defendant told him that he had failed a polygraph examination that had been administered to him because he lied to the postal inspectors regarding the murder of Mottinger.[2] No objection was lodged by defendant during this line of questioning. At another point during Ruffin's testimony, he was asked on redirect examination about a polygraph examination that he had taken.[3] However, on recross-examination, it

---

"Q How long did you talk to him?

"A Approximately, less than thirty seconds.

"Q Oh, o.k., what was the nature of the conference?

"A I asked him if he would be willing to take a polygraph on what his information was just to test the veracity of what he had to offer.

"Q Did you advise him that other people would be speaking with him later?

"A No, sir.

"Q And that was the last contact you had?

"A No, sir, it was not."

[2] On direct examination, Ruffin testified in this respect as follows:

"Q During the time that you discussed and you were cellmates with the defendant, did he ever indicate to you that he was talking to any policemen or anything about this case?

"A Yes, he did.

"Q What did he indicate to you?

"A He indicated that he was talking to this guy named Paul who used to come up every day and talk to him, he was investigating the case. And he said Paul caught him in several lies and the only way he'd possibly get found guilty was if Paul told he caught him in those lies. And he said he took the polygraph test and he failed it."

[3] The state questioned Ruffin on redirect examination concerning his plea agreement with the government after defense counsel extensively referred to such plea agreement during cross-examination. On redirect, Ruffin testified as follows:

"Q Andre, you have this exhibit, I'd like you to look at it again. Mr. McHenry read parts of it. I'd like you to refer to paragraph 2.

"A Uh-huh.

"Q Paragraph 2 begins ... Mr. McHenry didn't read all of it, but, 'Should Andre Ruffin provide such complete cooperation and satisfactorily demonstrate his truthfulness by any requested polygraph examination, the United States agrees that,' then it begins with the items that were followed after that.

"A Uh-huh.

"Q Is that right?

"A Yes.

"Q Were you requested to take a polygraph examination to verify the truthfulness of your statements?

"A Yes, I was.

"Q Did you do that voluntarily?

"A Yes, I did.

"Q I'd like you to refer to paragraph 3, it's on the third page, if you would. It says, 'Andre Ruffin expressly understands that he must at all times give complete,

was defense counsel who elicited from Ruffin the results of the polygraph examination administered to him.[4]

Upon a careful and extensive review of the transcript, evidence and arguments, we find no error of the magnitude that would compel a reversal with respect to Ruffin's testimony.

With regard to Ruffin's testimony concerning defendant's purported admission of having failed the polygraph examination, it is clear that such testimony was not elicited by the state but was freely given by Ruffin in response to a general question. Moreover, no objection was raised by defendant at the time this alleged error took place. In any event, given the numerous incriminating statements made by defendant to the postal authorities and others, Ruffin's testimony in this context was insignificant.

In reviewing the alleged errors involved in Ruffin's testimony, several aspects are readily apparent. First, no objection was made by the defense when the allegedly prejudicial state-

---

truthful, and accurate information and testimony. Should it be determined that Andre Ruffin has given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this agreement, then Andre Ruffin shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to perjury and obstruction of justice.' It goes on to talk more about that. But did you understand from that if you gave improper and false information, that could not only the entire plea agreement's thrown [sic] away, but you could be subject to additional charges?"

[4] On recross, Ruffin testified in response to defense counsel's questioning as follows:

"Q Now, the prosecutor talked about paragraph 2. And he said I didn't read paragraph 2, and he's right, I didn't. So we'll read it once again. 'Should Andre Ruffin provide such complete cooperation and satisfactorily demonstrate his truthfulness by any requested polygraph examination, the United States agrees that,' et cetera. You took a polygraph examination?

"A Yes, I did.

"Q When was that?

"A In '83. It was possibly '83, February or March, something like that.

"Q And who administered that polygraph to you?

"A I don't know his name.

"Q Where was it given to you?

"A At Lucas County, in the Federal Building.

"Q Pardon me?

"A In the Federal Building next to the Lucas County Jail.

"Q Do you know if this man worked for the United States Postal Inspectors?

"A No.

"MR. KEISTER: You Honor, we'll stipulate the polygraph operator was a United States Postal polygraph operator.

"MR. MCHENRY: Good enough, thank you.

"Q Mr. Ruffin, what do you know about polygraphs?

"A Nothing.

"Q The polygraph operator, he told you that you'd passed the polygraph, is that correct?

"A Yes.

"Q Did he ever show you the results of the polygraph? That is, the graph markings?

"A No, he just told me I passed.

"Q If he'd have shown you those graph lines, you wouldn't have been able to interpret them anyway, would you?

"A No, I wouldn't.

"Q So he told you you passed?

"A (Witness nods head, indicating what reporter purports to be yes.)

"Q But if he hadn't told you you passed, you wouldn't have known you passed, is that correct?

"A Right."

ments concerning polygraphs occurred. Second, the statement that Ruffin had passed a polygraph examination was elicited by defense counsel, not the prosecution, and no curative instruction was requested by defendant at that time. In such situations, the defense cannot invite error and later complain about its prejudicial effect on appeal. See, generally, *State v. Woodruff* (1983), 10 Ohio App. 3d 326, 10 OBR 532, 462 N.E. 2d 457; 5 Ohio Jurisprudence 3d (1978) 97, Appellate Review, Section 543 *et seq.* Third, the standards of *Souel, supra,* were not implicated here since no polygraph examination results were admitted during the trial.

The third instance defendant submits of prejudicial statements concerning polygraph examinations was during the testimony of postal inspector Thomas Strausbaugh. The defense maintained during trial that John Willier was the person who murdered Mottinger. Strausbaugh, a rebuttal witness for the state, testified on direct examination that he had questioned Willier, and that Willier agreed to take a polygraph examination to prove that he had not committed the murder.

While the defendant contends that Strausbaugh's testimony tended to bolster the credibility of Willier in that his alleged willingness to take a polygraph test indicates he did not murder Mottinger, we do not believe that such testimony constitutes error. Again, since no polygraph results were

admitted, the standards set forth in *Souel, supra,* do not apply to this testimony.

In reviewing all the instances of error defendant raises in his first proposition of law, it is clear that the most damaging testimony elicited was that from Ruffin. However, the weight of Ruffin's testimony concerning polygraph examinations is diminished by his other testimony that defendant admitted to him that he had killed the victim. While references to polygraph examinations can leave an improper impression on the factfinder since such references tend to support the testimony of a witness, there was no admission of polygraph examination results in the cause *sub judice*. Even though defendant eventually objected to the references to polygraph examination in Ruffin's testimony after other witnesses had already testified, such references did not constitute error since *Souel* was not violated. Accordingly, we find defendant's first proposition of law to be without merit.

In his second proposition of law, defendant contends that an alleged confession made by him and admitted at trial had not been provided during discovery pursuant to Crim. R. 16, and that such failure to disclose deprived him of a fair trial.

This proposition of law concerns the testimony of postal inspector Hartman, who, as a rebuttal witness for the state, testified on cross-examination that defendant told him that he had killed Mottinger.[5] Defense counsel ap-

---

[5] Hartman's testimony on cross-examination in this regard was as follows:

"Q  Do you ever recall taking [*sic*] to LuAnn Smith?

"A  I have spoken with Miss Smith, yes, sir.

"Q  At any time did you tell her that John Spirko killed Betty Jane Mottinger?

"A  I believe I made some statements to that effect.

"Q  Didn't it, isn't it a fact that you told her that he told you that, isn't that a fair assessment of it?

"A  That is a fair assessment, yes, sir.

"Q  Would you like to tell me when he told you that?

"A  He stated that to me at Levinworth [*sic*], Kansas, on January 11th, of 1983.

"Q  Well, let's take a look and see, o.k.,

parently never received this oral statement through discovery, as required by Crim. R. 16(B)(1)(a)(ii).

Defendant argues that this confession should have been disclosed to him pursuant to Crim. R. 16(B)(1)(a)(ii), which states in relevant part:

"(B) Disclosure of evidence by the prosecuting attorney.

"(1) Information subject to disclosure.

"(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:

"* * *

"(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer[.]"

The state argues that the confession was not an unequivocal statement that "I killed Betty Jean Mottinger," but, rather, it was a conclusion drawn by the postal inspector. The exact nature of defendant's statement was never explored during trial. The statement was not elicited by the state during direct examination, and there is no indication that the prosecutor knew of the statement. Nevertheless, the fact that the prosecutor did not know of the statement does not necessarily relieve the state of its responsibility.

While it is remarkable that such an admission was not disclosed to the prosecutor and was not made part of

the response to discovery, we believe that the failure to provide this statement does not necessarily warrant a reversal, absent a showing by defendant that the failure to comply with discovery requests prejudiced his ability to reveal a weakness in the state's case or his ability to present a credible defense more effectively. See *State* v. *Mitchell* (1975), 47 Ohio App. 2d 61, 1 O.O. 3d 181, 352 N.E. 2d 636.

In *State* v. *Parson* (1983), 6 Ohio St. 3d 442, 6 OBR 485, 453 N.E. 2d 689, syllabus, we held:

"Where, in a criminal trial, the prosecution fails to comply with Crim. R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made * * * to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim. R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim. R. 16(E)(3) by permitting such evidence to be admitted."

Accord *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 514 N.E. 2d 394. See, also, *State* v. *Moore* (1988), 40 Ohio St. 3d 63, 531 N.E. 2d 691.

In regard to factor one of *Parson, supra,* there is no evidence in this case that the nondisclosure was willful.

In regard to *Parson* factor two, defendant states that if he had had knowledge of the statement, he would have approached the trial differently and he would have been better informed in deciding whether to accept an alleged plea bargain offer. Defendant asserts that his decision to forgo

---

on that date, you would have written that down, wouldn't you?

"A   I don't believe that that is in my notes.

"Q   It wasn't important enough to put it in your notes?

"MR. HATCHER: No further questions."

the offered plea bargain, to testify, and to aggressively seek an acquittal, unquestionably hinged on the absence of an unequivocal confession.

In our view, this argument is purely speculative. Defendant merely argues that the disclosure of the confession could have possibly altered his decision concerning the acceptance of a plea bargain.

With respect to *Parson* factor three, whether the accused is prejudiced by the admission of the statement, we find that while this statement, standing by itself, could have been prejudicial, there were other witnesses who testified that defendant had admitted committing the murder.

In sum, the state's failure to provide Hartman's statement of defendant's confession does not, in itself, warrant a reversal. In our view, defendant has failed to show how the state's failure to comply with Crim. R. 16(B)(1)(a)(ii) prejudiced his ability to reveal a weakness in the state's case or in his ability to present a credible defense more effectively. Thus, we hold that the statement of Hartman in this realm did not deprive defendant of a fair trial and, therefore, defendant's second proposition of law is not well-taken.

In his third proposition of law, defendant contends that the trial court erred in admitting hypnotically refreshed identification testimony without first ensuring its reliability.

This proposition concerns the testimony of two witnesses, Opal Seibert and Mark Lewis, who allegedly saw defendant or one of his accomplices outside the post office on the date and time of the kidnapping. Defendant alleges that the trial court permitted testimony that was contaminated by hypnotic procedures.

In our view, this proposition of law is without merit. There is no evidence that any new evidence was revealed by the witnesses as a result of their being hypnotized. Seibert and Lewis both stated that they did not recall anything significantly new as a result of being hypnotized. In addition, the investigators stated that, other than insignificant observations, neither witness developed any new information.

Lewis testified that he saw a strange man outside the post office a few minutes before the victim was kidnapped. When Lewis returned to the village several hours later after having driven a truckload of grain out of town, he noticed a lot of commotion in the village. He told investigators that there was a strange man outside the post office that morning as he drove away. He was subsequently hypnotized, and under hypnosis he was asked to again describe the man. He stated at trial that he gave the same description after being hypnotized as he had given prior to being hypnotized, except that under hypnosis he stated that the man may have had a light mustache. In addition, Lewis testified at trial that he was not "positively sure" that the man he saw outside the post office was the person he picked out of the photo array (*i.e.,* the defendant).

Seibert testified that at the time the victim was kidnapped, Seibert was sitting on her breezeway and saw a strange man standing by a strange car. She also noticed the truck driven by Lewis go by at about the time that she was watching the strange man. She later picked out a photograph of the man whom she saw that day outside the post office (believed to be Gibson). At the suppression hearing, postal inspector Strausbaugh testified that no significant new information was revealed by Seibert:

"Q Upon a review of Mr. Sheehan's report, were there any matters, if you know, that were different in the report, as far as the hypnotic responses of Opal Seibert, from the original responses of Opal Seibert, from the original statement that she had given to you?

"A Nothing of substance different."

In regard to Lewis, the investigator testified that the new evidence received from Lewis was: "Nothing of substance, there was a few things about the chrome on the car and possibly one or two numbers of a license plate, but nothing of substance."

Since the post-hypnotic information was essentially the same as the pre-hypnotic information, there clearly was no admission of hypnotically refreshed testimony of any substance or significance and, hence, no error in this context. See State v. Maurer (1984), 15 Ohio St. 3d 239, 258, 15 OBR 379, 396, 473 N.E. 2d 768, 787.

Therefore, we find defendant's third proposition of law to be unmeritorious.

In his fourth proposition of law, the defendant contends that the trial court refused to consider relevant mitigating evidence, and improperly converted this mitigating evidence into nonstatutory aggravating circumstances. Defendant bases his arguments on the trial court's interpretation of the report of Dr. Goodman, a court-appointed psychiatrist, who stated in his report that appellant suffered a disorder as a result of childhood abuse by his father which reduced his capacity to conform his conduct to law.[6]

In our opinion, defendant's arguments are not well-taken. In the first instance, it is clear that the trial court considered the mitigating evidence, i.e., Goodman's report, even though defendant attempted to prevent his counsel from introducing it in evidence before the trial court. In our view, it is clear that the trial court considered the mitigating evidence, but found that it did not outweigh the aggravating circumstances. In the second instance, we believe that the trial court was merely considering the history, character and background of the defendant as required by R.C. 2929.04(B). The court's consideration of the nature and circumstances of the crime does not, ipso facto, indicate that the trial court has converted them into nonstatutory aggravating circumstances. As this court stated in State v. Bradley (1989), 42 Ohio St. 3d 136,

---

[6] In its sentencing opinion, the trial court reviewed Dr. Goodman's report and stated in relevant part:

"In this report, it is asserted that the defendant, due to physical and psychological abuse as a child, suffers from psychological problems that would make him capable of committing offenses such as the present one and that when he is in a period of depression, he lacks the ability to conform this conduct to the requirements of the law. Dr. Goodman further offers that if the defendant had been subjected to intensive therapy and psychological intervention as a child, he might have been cured, but he offers no suggestion that such might be the case now. The Court is of the opinion that while this factor might explain how an otherwise normal human being can kill and kill again, that without any suggestion that the defendant can be cured and prevented from continuing to commit such violent and antisocial acts against society in general and future helpless individual victims in particular, that this does not constitute a mitigation factor which would outweigh the aggravating circumstances proved in this case, and that it instead urges the imposition of the death penalty."

148, 538 N.E. 2d 373, 385: "* * * a trial judge '* * * may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors.' *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 99-100, 512 N.E. 2d 598, 604.''

Assuming, *arguendo,* that the trial court did improperly weigh the aggravating circumstances and mitigating factor, the independent review undertaken by this court will cure any error in this context. *Bradley, supra,* at 148, 538 N.E. 2d at 385; *State* v. *Holloway* (1988), 38 Ohio St. 3d 239, 242, 527 N.E. 2d 831, 835.

Since we find that defendant was not prejudiced as alleged, we find the foregoing arguments to be unmeritorious.

In his fifth proposition of law, defendant argues that the death penalty sentencing process under R.C. 2929.03(D)(3) is unconstitutional because it requires the imposition of the death sentence if the aggravating circumstances outweigh the mitigating factors.

As this court recently stated in *State* v. *Jells* (1990), 53 Ohio St. 3d 22, 36, 559 N.E. 2d 464, 477:

"The United States Supreme Court has recently decided that a mandatory sentencing scheme such as Ohio's is not unconstitutional. *Blystone* v. *Pennsylvania* (1990), 494 U.S. ___, 108 L. Ed. 2d 255, 110 S. Ct. 1078; * * *.''

Accordingly, the defendant's fifth proposition of law is overruled.

In his sixth proposition of law, defendant alleges numerous instances of prosecutorial misconduct that induced the jury to convict and sentence him to death according to factors which were irrelevant and highly prejudicial.

Upon a careful review of the entire record, we find that most of the examples cited by defendant occurred when the prosecutor was commenting on evidence that had already been admitted without objection. The balance of the examples cited by defendant encompassed instances of evidence that had been admitted over objection. We find, however, that defendant has failed to cite even one example of error under this proposition of law that deprived him of a fair trial. See *Maurer, supra,* at 266-267, 15 OBR at 402-403, 473 N.E. 2d at 793. Therefore, this proposition of law is not welltaken.

In his seventh proposition of law, defendant contends that the state argued several nonstatutory aggravating circumstances during its closing argument. Defendant submits that the state improperly argued about (1) community sentiment and the jurors' duty to protect society; (2) future dangerousness of defendant; (3) defendant's attitude toward killing; (4) defendant's lack of remorse; (5) defendant's involvement in unrelated and uncharged attempted murders; and (6) defendant's being on parole at the time of the crimes.

Of the above instances, it is noteworthy that numbers 2, 3, 5, and 6 were introduced by defendant. The defendant erroneously contends that "[t]he only evidence which the prosecutor may * * * [argue] at the mitigation phase is that of the aggravating circumstances alleged and proved at the guilt phase.'' This argument fails to consider R.C. 2929.04(B), which states that "* * * the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the of-

fender * * *." In an uncertain twist of logic, defendant contends that any factors argued by the state other than the aggravating circumstances at the mitigation phase are necessarily nonstatutory aggravating circumstances. We find this argument to be clearly erroneous since the nature and circumstances of the offense and the history, character, and background of the defendant are to be weighed by the trier of fact pursuant to R.C. 2929.04(B), and thus can be commented upon by the prosecution in its closing argument, especially when such matters are introduced by defendant.

With respect to the state's argument before the jury that it must protect society, this court held in *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 512 N.E. 2d 611, in a similar instance where the prosecutor argued the duty of society to protect itself by giving the defendant the death penalty, that the closing argument must be viewed in its entirety in order to determine whether the prosecutor's remarks were prejudicial. We agree with the court of appeals below that, in viewing the argument as a whole, as is required by *Byrd, supra,* the prosecutor correctly stated to the jury that the state is required to prove that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and correctly implied that the jury's deci-

sion must be based upon the evidence presented in court.

Defendant relies on *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061, to support his premise under this proposition of law, but *Johnson* involved a situation where the indictment itself improperly contained nonstatutory aggravating circumstances that were in fact presented as statutory aggravating circumstances. The cause *sub judice* contains no such blatant errors, and defendant has failed to support this argument with facts or law. Accordingly, this proposition of law is not well-taken.

In his eighth proposition of law, defendant argues that the trial judge committed reversible error when he remarked to prospective jurors prior to the commencement of trial that "[t]he legislature of the State of Ohio has determined that some, but not all murders, are either so heinous, shocking, or brutal that they may be punished by death." It is defendant's contention that such language forced the jury to consider this characterization as a nonstatutory aggravating circumstance.

Defendant objected to the trial judge's remarks and, subsequently, the court addressed the objection[7] and assured the parties that the objectionable words would not be made in future remarks to the jurors. At the

---

[7] The trial court's response to defendant's objection was as follows:

"THE COURT: * * * One final matter, before we go into Court, and that regards the objection that was made to certain language in the Court's preliminary remarks on Monday morning to prospective jurors, particularly the objection to the words, 'heinous, shocking and brutal' as describing certain murders that may be punished by death, the Court would like the

record to reflect that this text of these remarks was made available to all counsel on Saturday morning in chambers; it was read to defense counsel; the language was borrowed from material that was submitted by defense counsel; and there were no objections made until after the Court made the remarks in open court. Furthermore, for the record, these three words have been excised from any further remarks that the Court will make to prospective jurors."

close of trial, the court properly charged the jury without using the words "heinous, shocking, or brutal."

In *State* v. *Tyler* (1990), 50 Ohio St. 3d 24, 38, 553 N.E. 2d 576, 593, this court held that similar comments were not objectionable, inasmuch as they were not submitted to the jurors as final jury instructions. Accordingly, we believe that defendant has failed to show that as a result of the improper preliminary remarks the jury was forced to consider nonstatutory aggravating circumstances. Therefore, based on *Tyler, supra,* we reject defendant's eighth proposition of law.

In his ninth proposition of law, defendant contends that the trial court erred by denying his motion for a new trial. While defendant's motion was not filed within fourteen days of the verdict as required by Crim. R. 33, this deadline does not apply to newly discovered evidence. Even assuming, however, that defendant's argument in this context is based on newly discovered evidence, we find that it nevertheless is devoid of merit.

Defendant's argument here is based on the conduct of one of the investigators, detective Ralph Eversole of the Van Wert County Sheriff's Department. It is alleged that despite an order for separation of the witnesses, Eversole regularly had contact with potential state's witness Debra Youngs, the sister of John Willier, a person who the defense claimed was responsible for the murder. This contact consisted of daily phone calls in which Eversole told Youngs of the testimony of the witnesses who had preceded her in the trial.

Crim. R. 33 states in pertinent part:

"(A)  Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

"* * *

"(2)  Misconduct of the jury, prosecuting attorney, or the witnesses for the state[.]"

Assuming that the allegations in the new trial motion and supporting affidavits are true, there is little doubt that the relationship between Youngs and Eversole, wherein he discussed the testimony of witnesses, was highly improper. Error would occur if, by this contact, the substantial rights of the defendant were affected.

Youngs was used as a rebuttal witness for the state. She testified that John Willier's trailer did not have any blood in it during the week of October 10, 1984. Her testimony was used to counter the testimony of defendant that he saw "gooey" blood in the bathtub and "stains" in the kitchen of a trailer.

In our view, this testimony does not directly affect the evidence that was presented against defendant. It does, however, appear to affect his defense that Willier had committed the murder. Nevertheless, we believe that the independent evidence introduced against defendant is overwhelming enough to sustain his conviction. Thus, in light of the other evidence presented at trial, we find the substantial rights of the defendant were not affected in this context under this proposition of law.

The second allegation by appellant in his ninth proposition of law concerns Leon Connors, who testified that defendant told him of his involvement in the murder. A fellow inmate of Connors, one Paul Gardenhire, averred that Connors told him that he had been assured that he was to receive a positive recommendation to the Parole Board in exchange for his testimony. The gist of defendant's argument is that since the state did not provide him, through discovery, with information of any deals or promises made to

any witness, defense counsel was unable to effectively cross-examine Connors in regard to this alleged deal.

Upon a careful review of the record, we find that there is no credible evidence presented that Connors was promised a favorable recommendation in exchange for his testimony. Indeed, Connors testified he was put in the witness protection program because of concerns for his safety and that this action was not part of any deal. Accordingly, since defendant has failed to show how the Youngs and Eversole relationship affected his substantial rights, and since he has not shown that Connors was given a deal, we find this proposition of law is not well-taken.

In his tenth proposition of law, defendant alleges that the prosecutor committed prejudicial error by presenting evidence to the jury during the guilt phase that defendant had been convicted of and sentenced for a prior murder since he elected, pursuant to R.C. 2929.022, to have the judge determine the existence of the murder conviction prior to sentencing and out of the hearing of the jury.

The notes of postal inspector Cline recorded that defendant told him that he wanted to make a deal and that he had previously served thirteen and a half years of a life sentence. When the inspector read that statement into evidence, he was careful not to read that particular portion of his notes referring to a life sentence. However, when the document was admitted into evidence, the reference to a life sentence was not deleted. Defendant submits that the reference to a life sentence caused the jurors to know that he had a prior murder conviction.

While defendant testified that he had been convicted of murder, he contends that he would not have taken the stand if he had known the prosecutor had already presented evidence of his prior murder conviction. We find this to be pure speculation, since it appears from defense counsel's opening statement that defendant already had intended to testify. In his opening statement, defense counsel made references to defendant's criminal history and intimated that certain testimony was going to be presented.

At the time Cline's notes were admitted into evidence, apparently none of the parties remembered to delete the reference to defendant's prior life sentence. After careful consideration, we believe that the reference to the life sentence was made inadvertently and was just as much the result of inadvertence on the part of defendant as it was of the state. Accordingly, in light of the other evidence presented by defendant with respect to his prior murder conviction, we find that the admission of evidence of his prior life sentence did not amount to prejudicial error and, therefore, this proposition of law is not well-taken.

In his eleventh proposition of law, defendant asserts that the trial court's failure to make a complete and accurate record of one hundred forty objections and other proceedings denied him a fair trial. In thirty instances, objections were made of record followed by off-the-record bench conferences with counsel for both parties. In ten instances, the trial judge asked counsel to approach the bench, which resulted in immediate adjournments. At other times, counsel or the court asked if the attorneys could approach the bench. In addition, there were thirty-one instances during *voir dire* where counsel approached the bench.

Curiously, in none of the examples given by defendant has he commented on its significance; he simply argues that without a complete transcript, he could not obtain meaningful appellate review.

Upon reviewing all the instances defendant claims were improperly

recorded, we find that defendant has failed to demonstrate how he was prejudiced. Clearly, defendant has not followed App. R. 9(C), which states in relevant part that "* * * the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection." Since defendant has not followed App. R. 9(C), chose not to request to have any off-the-record conferences recorded, and most importantly, has not shown how he was prejudiced, we overrule this proposition of law.

In his twelfth proposition of law, defendant alleges ineffective assistance of counsel by his trial counsel in failing to preserve error. All the alleged errors are based largely on other propositions of law that are considered in this opinion.[8] Based on the standard

---

[8] The instances of ineffective counsel in failing to object cited by defendant and the accompanying propositions of law are as follows:

(1) The trial court's failure to maintain a full and complete record of all proceedings, including objections made at the bench. Proposition of Law No. 11.

(2) The prosecutor's elicitation of and argument regarding inadmissible and prejudicial evidence. The defense counsel objected to only a very few of the references. Proposition of Law No. 6.

(3) The prosecutor's breach of the confidential relationship between the defendant and Leon Connors. Proposition of Law No. 21.

(4) The trial court's dismissal, in the absence of objection or stated reasons, of juror Giessler. Proposition of Law No. 24.

(5) The trial court's excuse of jurors without permitting defense counsel to question them. Proposition of Law No. 25.

(6) The failure of the trial court to hold a competency hearing and make a competency evaluation of the defendant when he refused to allow a mitigation defense to be presented. Proposition of Law No. 19.

(7) Refusal of the court to grant the motion for a change of venue. Proposition of Law No. 27.

(8) Admission by the state of confession to charges not disclosed in discovery and the failure of the trial court to exclude the surprise confession. Proposition of Law No. 2.

(9) The failure of the trial court to allow defense counsel to present mitigating evidence over the objections of the defendant. Proposition of Law No. 14.

(10) State's witness Ashley's references to searches of defendant's cell related to criminal activity. Proposition of Law No. 41.

(11) Failure of the trial court to give a guilt phase limiting instruction regarding defendant's prior convictions. Proposition of Law No. 10.

(12) Trial court's instruction that the jury could consider any factor in determining whether defendant should be sentenced to death. Proposition of Law No. 52.

(13) Trial court's unconstitutionally vague "weighing" instruction and failure to define aggravating circumstances and mitigating factors. Proposition of Law No. 50.

(14) Trial court's instruction regarding the necessity of a unanimous verdict. Proposition of Law No. 54.

(15) The failure of the trial court to excuse for cause jurors Fronefield et al. Proposition of Law No. 27.

(16) The admission of a look-alike purse. Proposition of Law No. 44.

(17) The admission of a model cloth. Proposition of Law No. 46.

(18) The admission of an unauthenticated handgun. Proposition of Law No. 43.

(19) The admission of hearsay testimony. Propositions of Law Nos. 42 and 47.

(20) The court's instruction permitting the presumption of the material fact of venue. Proposition of Law No. 53.

(21) The court's instruction on the lesser included offense of murder. Proposition of Law No. 49.

of law articulated in *Strickland* v. *Washington* (1984), 466 U.S. 668, 694, we find defendant's twelfth proposition of law to be without merit.

In his thirteenth proposition of law, defendant claims error by the trial court when it made the following instruction during the penalty phase: "Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. * * *" It is defendant's contention that the court's use of the words "truth of the charge" means that since the jury already found defendant guilty of the "charge" during the guilt phase, it had no choice but to recommend the death penalty. Continuing, defendant asserts that since the jury was already convinced of "the truth of the charge" at the close of the guilt phase of the trial, an unconstitutional presumption of the propriety of the death penalty was the natural result of the trial judge's instruction.

In our view, defendant's argument is totally devoid of merit. The trial court's instruction on reasonable doubt was given at the end of both the guilt and penalty phases of the trial. However, defendant ignores the requirement that the jury must weigh the aggravating circumstances against the mitigating factor(s), and the trial court so stated at least three times during its instruction at the penalty phase. In addition, defendant did not object to the instruction at the time it was given. We find his arguments in this vein to be not well-taken.

In his fourteenth proposition of law, defendant argues that to allow a capital defendant the option of preventing the introduction of mitigating evidence at the sentencing hearing is to essentially permit a state-assisted suicide.

Prior to the penalty phase of the trial, defendant informed the court that he did not want his attorneys to present any mitigating evidence. The trial court engaged in a thorough inquiry of defendant concerning his rights, as well as the duty of the state to prove in the mitigation phase of the trial that the aggravating circumstances outweighed the mitigating factors. Notwithstanding the wishes of defendant, the trial court did admit into evidence a psychiatric report containing a psychiatric evaluation of defendant. However, this court held in *Tyler, supra,* at 27-29, 553 N.E. 2d at 583-586, that a defendant is permitted to prevent his counsel from presenting mitigation evidence. Based on the reasoning in *Tyler, supra,* we find this proposition of law to be without merit.

In his fifteenth proposition of law, defendant contends that the trial court abused its discretion in denying his motion for a continuance, and thus denied him due process and a fair trial.

In arguing for a continuance, defendant stated that until he could interview some out-of-state witnesses, review the postal inspector's handbook, and try to discover further witnesses already interviewed by postal inspectors, he was not ready to go to trial. This argument is premised on a motion for a continuance made by defendant on June 21, 1984. The motion was denied and the jury selection began on July 30, 1984. The court had granted three previous motions for continuance filed on October 13, 1983, November 10, 1983, and March 9, 1984.

Prior to trial, defendant asserted in his June 21 motion that he needed a continuance because: "Counsel for the defendant has not had adequate discovery from the prosecution. The independent counsel appointed to examine the prosecution's files has so far

proven fruitless, yet investigators for the defense continue to turn up evidence and witnesses which are directly exculpatory as to John Spirko."

Clearly, the granting of a continuance is within the discretion of the trial court. *State* v. *Unger* (1981), 67 Ohio St. 2d 65, 21 O.O. 3d 41, 423 N.E. 2d 1078, and R.C. 2945.02. Defendant, however, mistakenly relies on *Johnson, supra,* as authority for his position. In *Johnson,* this court held that the trial court should have granted a continuance because of newly discovered evidence that consisted of two witnesses who could have possibly been at the scene of the crime and were not interviewed by the investigating authorities. The defendant therein requested a one-week continuance, which was denied.

In the instant case, the information sought was clearly not of the same degree. Whether the postal inspector's handbook was of significance is purely speculative. The defendant's stated need to discover "further witnesses" is similarly speculative, especially since the prosecution agreed to an unprecedented procedure in which the entire investigative file was reviewed by an independent counsel, whose report was made to the court and made part of the record. The other reason given by defendant, *i.e.,* the need to interview out-of-town witnesses, is insufficient since defendant had more than a month after the motion was filed to interview the witnesses.

In our view, the trial court did not abuse its discretion in denying the request for a continuance, inasmuch as defendant failed to indicate a particularized need for one. Accordingly, we overrule defendant's arguments under this proposition of law.

Defendant's next proposition of law expands on the one just discussed.

In his sixteenth proposition of law, defendant asserts that the lower court abused its discretion, and thus violated his right to due process of law, when it failed to grant him a continuance to secure the testimony of two out-of-state witnesses.

The two witnesses are Doris Kilgore and Dusian Krivoski, who are employees of the Eddyville, Kentucky prison where defendant had been incarcerated. Defendant alleges that the testimony of these witnesses was crucial to support his alibi defense. Defendant submits that on August 9, 1982, he called the Eddyville prison at 2:14 p.m. to ask that his television be shipped to him in Swanton, Ohio, where he lived with his sister. Krivoski supposedly received his call and Kilgore shipped the television set. However, even if this had happened at 2:14 p.m. on the date in question, defendant still would have had time to kidnap the victim at 8:30 a.m. and return to Swanton, since Swanton is about a two to two-and-one-half hour drive from Elgin. In addition, defendant testified — and his sister, Cathy Carpenter, supported such testimony — that he was in the Swanton-Toledo area the entire day of August 9, 1982.

While defendant asserts that the trial court abused its discretion by not granting the continuance, we note that defendant had almost one year to prepare for trial, and had been granted three continuances on October 13, 1983, November 10, 1983, and March 9, 1984. After his request for the continuance in issue was denied, the trial court stated that he still had had ample time to subpoena the witnesses or to take their depositions. This, however, was not done by defendant.

In support of his argument, defendant again cites *Johnson, supra,* where this court held that the trial court should have granted a continuance

because of newly discovered evidence of two witnesses who could have been at the scene of the crime and who had not been interviewed by authorities. As mentioned earlier, the defendant in *Johnson* requested a one-week continuance, which was denied. In our view, the *Johnson* case is not on point.

Accordingly, since defendant had previously been granted three continuances and failed to take the court's suggestion to obtain a deposition or to enforce that subpoena, we find that he has not shown an abuse of discretion. In addition, both parties stipulated at trial that defendant had called Krivoski at the Eddyville prison, but defendant never mentioned during trial the exact time of 2:14 p.m. Even assuming that defendant had made the call at 2:14 p.m., he still would have had ample time to kidnap the victim at 8:30 a.m. and travel to Swanton by 2:14 p.m. The trier-of-fact apparently chose not to believe his alibi, and it is our view that such testimony would have added little to the purported alibi.

Since we believe the trial court did not abuse its discretion in not granting the continuance, *Unger, supra,* we reject defendant's arguments under this proposition of law.

In his seventeenth proposition of law, defendant argues that he was deprived of due process when the trial court advanced the date of the mitigation hearing. We believe, however, that since the defendant declined to present any mitigation evidence, no compelling reason existed not to have the hearing held as soon as possible.

Once again, it should be underscored that defendant informed the court that he had forbidden defense counsel to call any mitigation witnesses on his behalf. The court then conducted an extensive interview with defendant, informing him of all his rights, and he clearly chose to waive his right to present mitigation evidence.

Defendant also signed a waiver of rights form, which was made a part of the record and filed on August 27, 1984. Defendant requested the jury to impose the death penalty, even though he continued to maintain his innocence. Since a defendant is permitted to prohibit his attorney from presenting any mitigation evidence, *Tyler, supra,* defendant here has failed to show how he was deprived of a fair trial. Accordingly, this proposition of law is not well-taken.

In his eighteenth proposition of law, defendant contends that the death sentence must be set aside, since the trial court considered irrelevant and prejudicial factors and failed to consider mitigating evidence.

We find defendant's arguments here are not well-taken. Defendant alleges that the trial court considered aggravating circumstances that were not contained in the indictment. This, however, is not true. While citing the nature and circumstances of the crime, the trial court stated that "[t]he defendant, by his own admission states that the victim was kidnapped from the scene of this less than significant theft for the sole reason that she could recognize their faces and thus identify them to law enforcement officers subsequently investigating the robbery." This clearly constitutes a consideration of the nature and circumstances of the crime. The statutory circumstances that were contained in the indictment and proven at trial were cited by the court at the beginning of its sentencing opinion.

Upon a careful review of the record, we find that there is no evidence that the court considered aggravating circumstances that were not part of the indictment.

Defendant also asserts that the

court considered nonstatutory circumstances such as evidence of sexual assaults on the victim, that defendant was glad that he had participated in the crime, the future dangerousness of the defendant, the helplessness of the victim, and the similarity of this crime to the other murder defendant had committed. This, again, is merely a recitation of the nature and circumstances of the crime and the history of the defendant. Accordingly, we overrule this proposition of law.

In his nineteenth proposition of law, defendant contends he was denied due process when the trial court failed to conduct a competency hearing upon defendant's decision to preclude presentation of mitigation evidence on his own behalf. However, we find that there is no requirement that a court hold a competency hearing where the defendant indicates that he wishes to prohibit his attorneys from presenting mitigating evidence. R.C. 2945.37 states that if the issue of competency is raised during trial, the court must hold a hearing *only* for good cause shown. In *Tyler, supra,* at 29, 553 N.E. 2d at 585, this court held: "Thus, even if a capital defendant waives mitigation completely because he wants to be executed, that waiver does not by itself call his competence into question."

In the instant cause, the court specifically asked defendant whether there was anything the court should be aware of concerning his mental or physical condition that would have any bearing on its decision to prohibit his counsel from presenting mitigating evidence on his behalf. Defendant responded in the negative.

Based on R.C. 2945.37 and *Tyler, supra,* we overrule the foregoing proposition of law.

In his twentieth proposition of law, defendant contends that the record developed during both the guilt and penalty phases of trial is so replete with errors that the sentence of death rendered below is unreliable and inappropriate. Defendant's argument here is a catchall proposition of law, because he claims that all the errors committed below are so numerous that to list them all would double the length of his brief. Defendant points out that the main errors are spelled out in other propositions of law before this court.

In our view, this proposition of law is not well-taken since defendant has failed to provide examples of the other errors committed below that this court should consider. Upon a careful review of the entire record and the court of appeals' decision below in light of R.C. 2929.05, we overrule defendant's twentieth proposition of law.

In his twenty-first proposition of law, defendant claims he was denied effective assistance of counsel since his "jailhouse lawyer," Leon Connors, was permitted to testify against him. Defendant submits that since Connors assisted him in filing some motions before the trial court, this created an attorney-client relationship which would compel exclusion of Connors' testimony under the attorney-client privilege.

We find defendant's arguments in this vein to be unmeritorious. In order for the communication between Connors and defendant to be excluded, Connors must have been engaged to represent defendant as legal counsel. R.C. 2317.02(A). Here, no attorney-client relationship was established, inasmuch as Connors was not a licensed attorney. In addition, we find nothing in the record to indicate that the information obtained by Connors from defendant was obtained prior to the time Connors ever contacted the investigators involved in the Mottinger murder case. Accordingly, this proposition of law is not well-taken.

In his twenty-second proposition of law, defendant contends that the state failed to inform him of the charges filed against him, thus causing an "unavoidable surprise" which hampered his defense.

We find this proposition of law to be without merit. In the original indictment, Count II provided as follows: "John George Spirko, Jr. did on or about August 9, 1982, purposely, and with prior calculation and design, cause the death of Betty J. Mottinger, same being Aggravated Murder, a capital offense in violation of ORC 2903.01(B)." The state was later granted a motion to amend the indictment to state that the correct section was R.C. 2903.01(A). The language of 2903.01(A) states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Upon a careful review of the record, it is clear that the state merely caused the correct section number to be applied to the indictment. The language itself was not changed, and it is unclear how defendant can claim that he was "surprised" in any way. Pursuant to Crim. R. 7(D), the trial court may at any time amend the indictment as long as no change is made in the name or identity of the crime charged. Based on the foregoing, this proposition of law is summarily rejected.

In his twenty-third proposition of law, defendant argues that the state, as a matter of law, cannot use a general intent murder statute of another state in order to prove a death penalty specification.

R.C. 2929.04(A)(5) is an aggravating circumstance directed at those defendants who are repeat offenders (see Committee Comment to former version of R.C. 2929.04[A][5] in H.B. No. 511). Under this provision, the state was required to prove that the defendant was convicted of murder under a Kentucky statute "* * * an essential element of which was the purposeful killing of * * * another."

Defendant attempts to argue that the Kentucky statute is a general-intent statute; however, the jury instructions given by the Kentucky court at the end of defendant's trial there stated: "The word 'willfully,' as used in these Instructions, means: intentionally, not accidently [sic] or involuntarily." Since "purposely," as defined by R.C. 2901.22, states "[a] person acts purposely when it is his specific intention to cause a certain result * * *," we find no merit to defendant's argument that the prior conviction in Kentucky does not conform to the requirement of a prior purposeful killing, since "willfully" in Kentucky is, for all practical purposes, identical to "purposely" under Ohio law. Accordingly, this proposition of law is not well-taken.

In his twenty-fourth proposition of law, defendant contends that he was deprived of a fair trial when the court dismissed a prospective juror without a challenge or finding of unsuitability.

We believe this proposition of law is unmeritorious. The prospective juror, Sherrill Giessler, stated to the court during *voir dire* examination that under no circumstances could she recommend a sentence of death. The record indicates that she was examined by both sides. The pertinent part of her testimony was as follows:

"Q You would not follow the Judge's instructions from the bench, if that would be the case, and I am not necessarily saying that it would be — but you would not follow that, you would not be able to complete your sworn duty as a juror in this matter, to abide by the Court's instructions of the law?

"A No."

R.C. 2945.25(C) provides in relevant part that a person may be challenged for cause if, "[i]n the trial of a capital offense, * * * he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. * * *"

In *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984, this court held in paragraph three of the syllabus: "The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath * * *." Based on this standard, we find that the court below took the appropriate action by dismissing prospective juror Giessler. Accordingly, we overrule this proposition of law.

In his twenty-fifth proposition of law, defendant argues that he was denied a fair trial based on the trial court's dismissal of three prospective jurors without the opportunity for defense counsel's questioning.

A review of the transcript reveals that the three jurors unequivocally stated before the court that under no circumstance would they recommend the death penalty.

This court held in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 186, 15 OBR 311, 330, 473 N.E. 2d 264, 286, that "[t]he general rule is that the scope of the examination of prospective jurors is within the discretion of the trial court and the judgment will only be reversed upon a showing that the trial court abused its discretion in restricting the scope of *voir dire*. * * * [Citations omitted.]" Clearly, the court here did not abuse its discretion by dismissing the three prospective jurors who

unequivocally stated that they could not recommend the death penalty. *Rogers, supra.* Accordingly, this proposition of law is not well-taken.

In his twenty-sixth proposition of law, defendant asserts that the trial court committed prejudicial error in denying his challenge for cause on prospective juror, Julie Ann Doner, and thus forced him to exhaust prematurely one of his peremptory challenges.

During *voir dire,* the following exchange with Doner took place:

"Q   * * * Do you think this guy might have done it; he probably did do it; what's your impressions?

"A   Well, I suppose again, since his name has been connected, he has been charged, you know, I would feel, you know, more that he would be — I don't want to say guilty, but I feel that he is more likely to be guilty than someone else, and yet they, you know, when they said they caught, or you know, had them in custody, you know, I did breathe a little sigh of relief that, oh, they did get the guy, so, yes, I would agree with you there."

However, upon further inquiry, Doner stated that she could set aside her bias, and base her decision solely on the evidence presented at trial:

"It might have a certain bearing, but I think it's a little different when you are sitting on the jury, if that's where I would end up, that you would listen to the evidence more closely; you would pay attention; you would start out fresh; whereas if you are just, I want to say outside, just reading the papers and such, you just, you know, if you are not involved with it, you might just say they have got the guy and forget about it; whereas, I believe, you know, being more involved with it, yes, I could put it aside."

R.C.   2945.25(B)   provides that: "* * *   [N]o person summoned as a

juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." See, also, *Rogers, supra.*

Since we find that the trial court did not abuse its discretion with respect to its decision concerning Doner, we overrule this proposition of law.

In his twenty-seventh proposition of law, defendant argues that the trial court erred in failing to grant his motion requesting a change of venue. Defendant submits that his counsel had conducted a public opinion poll of residents of Van Wert County which tended to show knowledge of the Mottinger murder and prejudice against the defendant. In addition, defendant claims that the public was saturated with stories about the case, and that the press reported details of the crime in a lurid manner. Defendant also claims a change of venue was necessitated by press reports that he was on parole and that he had a prior criminal record involving, *inter alia,* murder and felonious assault.

Crim. R. 18(B), R.C. 2901.12(I) (now [K]) and 2931.29 provide for a change of venue when it appears to the court that a fair and impartial trial cannot be held in the county where a cause is pending.

In *State* v. *Fairbanks* (1972), 32 Ohio St. 2d 34, 37, 61 O.O. 2d 241, 243, 289 N.E. 2d 352, 355, this court stated in relevant part:

"A change in venue rests largely in the discretion of the trial court, and there are numerous cases holding that appellate courts should not disturb the trial court's ruling on a motion for a change of venue in a criminal case unless it is clearly shown that the trial court had abused its discretion. * * * [Citations omitted.]

"* * * Newspaper accounts and radio broadcasts of a factual nature and without distortion, or which are noninflammatory in character, do not establish the impossibility of a defendant to have a fair and impartial trial where jurors have not read or heard the reports or such prospective veniremen have testified on *voir dire* that they will judge the defendant solely on the law and evidence presented at trial." Accord *Maurer, supra,* at 250, 15 OBR at 388-389, 473 N.E. 2d at 780-781.

In addition, we also noted in *Maurer, supra,* that "[i]t has long been the rule in Ohio that '[t]he examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant * * *.'" *Id.* at 251, 15 OBR at 389, 473 N.E. 2d at 781, quoting *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 34 O.O. 2d 270, 214 N.E. 2d 417, paragraph one of the syllabus.

In the instant case, after undergoing an extensive *voir dire* encompassing approximately five days, the jurors who were ultimately selected all stated that they were not biased with respect to the guilt or innocence of defendant, that they would listen to the evidence presented, that they would follow the judge's instructions and the law, and that they were not influenced by the media.

In our view, the responses from the jurors selected clearly complied with the standard enunciated in *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, at 5, 514 N.E. 2d 407, at 412, concerning pretrial publicity: "In making this decision, the trial court should scrutinize closely the *voir dire* examination of prospective jurors. An

important consideration in deciding whether pre-trial publicity has acted to prevent the defendant from having a fair trial is whether a '* * * juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court * * *.' *Irvin* [v. *Dowd* (1961), 366 U.S. 717,] * * * 723."

Here, the court presided over an extensive *voir dire* and the selected jurors responded that, in light of the pretrial publicity, they would follow the law and base their decision on the evidence presented at trial. The court's reliance on the truthfulness of the juror's responses was not, in our opinion, an abuse of discretion that warrants a reversal. Therefore, the foregoing proposition of law is not well-taken.

In his twenty-eighth proposition of law, defendant contends that he was deprived of a fair trial because the court abused its discretion in restricting defendant's *voir dire* examination of prospective jurors.[9] We disagree.

The questions upon which objections were sustained do not, in our view, clearly involve an "abuse of discretion" as this court has defined that term. See, *e.g., Steiner* v. *Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E. 2d 855, paragraph two of the syllabus. In fact, one could char-acterize all the prohibited questions as being largely irrelevant. As such, having found no abuse of discretion on the part of the trial court, we reject defendant's arguments under this proposition of law.

In his twenty-ninth proposition of law, defendant argues that he was denied a fair trial as a result of the trial court's failure to suppress his statements that were made to the postal inspectors.

Defendant alleges that the statements made to postal inspectors were made for the sole purpose of assisting the state in convicting the actual murderers in the Mottinger case, and that it was implied to him that the statements he made would not be used against him.

Contrary to the assertions of defendant, prior to each time he talked to the postal inspectors, he signed a warning and waiver of rights containing the standard *Miranda* warnings, which included the statement that anything he said could be used against him in court.

The record indicates that defendant was not offered immunity, but that he did agree to the following in exchange for his information:

(1) that the state recommend that the defendant serve concurrent sentences for the two counts of

---

[9] Defendant cites seven instances in the record in which the state's objections to *voir dire* questions were sustained. A review of the record indicates that objections to the following questions were sustained by the trial court:

(1) Should the death penalty be applied to persons convicted of rape?

(2) What does reasonable doubt mean?

(3) What might inmates talk about in prison?

(4) What is the community's opinion of the defendant's guilt?

(5) What does the juror expect to see during trial?

(6) How did the law enforcement officers decide appellant committed the murder?

(7) A statement, that was more of an opening statement than a *voir dire* question, by defense counsel that: "Johnny Spirko was not involved in this killing; he was told things about it by somebody else who was; but he himself wasn't there."

felonious assault to which the defendant pleaded guilty;

(2) that the remaining charges against the defendant in Fulton County be dismissed as soon as the defendant provided full and complete information regarding the robbery, abduction and homicide of the Elgin postmaster;

(3) that the state assist the federal government in placing the defendant in the Federal Witness Protection Program during and after sentencing and that the defendant serve his sentence in a federal penal institution; and

(4) that the state recommend probation for the defendant's girlfriend, LuAnn Smith.

We find that defendant was fully informed of his *Miranda* rights each time he talked to the postal inspectors, and that there has been no showing that any of his statements to the postal inspectors was involuntary. Accordingly, we overrule the foregoing proposition of law.

In his thirtieth proposition of law, defendant contends that there was a contract between him and the postal authorities in which the defendant disclosed information in regard to the Mottinger case for informational purposes only, and not so that he could later be prosecuted. Since he was prosecuted, defendant asserts that the state has breached the contract and, as a result, the state must uphold its bargain with defendant by either putting him in the place he was before being indicted, or by suppressing the statements he made to the postal authorities.

Upon a careful review of the record, we find no evidence of any such agreement. Defendant signed a waiver of rights form which included the acknowledgement that anything he said could be used against him in court.

Although the defendant was offered an agreement in this case, no part of the agreement discussed immunity as to these charges.

Accordingly, since defendant has failed to establish the existence of any other agreements, this proposition of law is not well-taken.

Defendant, in his thirty-first proposition of law, asserts that he was deprived of a fair trial by the use of evidence illegally seized from his prison cell.

Defendant's argument in this vein concerns an unmailed letter that was found in his prison cell during a search after he attempted to commit suicide. The letter, referred to by the prosecutor during trial, contained an admission by defendant that he had stolen some goods from the residence of his girlfriend.

In *Hudson* v. *Palmer* (1984), 468 U.S. 517, the United States Supreme Court held that prisoners do not have an expectation of privacy, and that the Fourth Amendment prohibition against unreasonable searches and seizures does not apply to them.

While acknowledging the holding of *Hudson,* defendant nevertheless argues that the prohibition applies only to searches that are directed toward prison security. We disagree. The language of the court in *Hudson* is unequivocal:

"* * * [W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. * * *" *Id.* at 525-526.

In his thirty-second proposition of law, defendant contends that a suggestive photo array presented to witness Mark Lewis led to the misiden-

tification of him as a suspect who was present at the crime scene.

At trial, Lewis testified that he was shown three photo arrays five months after the incident, and that he picked out the defendant's picture from one of the arrays. When asked how certain he was that defendant was the person he had seen outside the post office shortly before the victim was kidnapped, he stated that he was seventy percent certain.

Based on the standards articulated in *Manson* v. *Brathwaite* (1977), 432 U.S. 98, we cannot find that the photo array led Lewis to misidentify defendant. Accordingly, we overrule this proposition of law.

In his thirty-third proposition of law, defendant argues that the state's failure to provide defense counsel with exculpatory or favorable evidence deprived him of a fair trial.

Defendant's discovery request included the following:

1. Information regarding Sonny Baumgardner (who was selected by Mark Lewis as having features similar to those of one of the persons seen outside the post office), and other suspects investigated by the state and the postal inspectors.

2. Fingerprints that were found by the investigating officers at the post office and all fingerprints compared to the discovered prints.

With respect to the first of these requests, the defendant does not have a right to the names of those persons whom the state at one time considered to be suspects. Crim. R. 16(B)(2) states in relevant part:

"* * * this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." Clearly, any list of possible suspects would fall under this rule.

With regard to the second request, defendant argues that the court refused to permit defense counsel to ascertain whether the prints matched those of any other suspect in the case. Defendant, however, has failed to point out that the fingerprint expert for the postal inspectors testified that he lifted fourteen prints from the post office and failed to get any matches upon comparing those prints with the prints of the fourteen suspects.

Furthermore, as was pointed out earlier in this opinion, the entire investigative file was reviewed by independent counsel, who concluded that the state had not failed to release any exculpatory evidence to defendant. Accordingly, we find this proposition of law to be not well-taken.

In his thirty-fourth proposition of law, defendant argues that he was prejudiced by the state's failure to provide him with impeachment evidence of two of the state's witnesses (Leon Connors and Andre Ruffin) prior to their testimony at trial.

The state claims that it was unable to secure the full criminal records of the witnesses from their respective penal institutions, and was able to provide only partial records to defendant prior to trial.

While the defendant contends that the state's failure to provide such material was willful, we cannot agree. Upon carefully reviewing the record, we believe that the state made a good faith effort to provide such records but was unable to do so until prison authorities arrived in court just before cross-examination of the witnesses in question. A review of the trial transcript of both witnesses reveals that defense counsel was able to exten-

sively cross-examine both witnesses with regard to their prior criminal records.

Since defendant has been unable to demonstrate how he was prejudiced by the delay, we overrule this proposition of law.

In his thirty-fifth proposition of law, defendant contends he was prejudiced when the state's expert witness (Steven Crabb) was not permitted to testify as to the identities of fourteen suspects whose fingerprints were compared to those found in the Elgin post office on the day of the murder.

In our view, defendant has not shown the relevance of his request under Evid. R. 401. In addition, we do not believe the court abused its discretion in refusing the defendant's request. As the state points out, the court may have excluded the names of all fourteen suspects so as not to confuse or mislead the jury. Evid. R. 403(A). Accordingly, this proposition of law is overruled.

In his thirty-sixth proposition of law, defendant contends that he was deprived of a fair trial when an expert witness was not allowed to testify as to the statistical probability that paint found on the victim's shroud matched paint found on houses that John Willier had painted.

The witness in question, Larry Dehus, testified for defendant that paint spots found on the victim's shroud were consistent with paint from houses painted by Willier. On redirect examination, defendant asked Dehus to testify as to the mathematical probability that the paint was from the same source in order to support defendant's theory that others (such as Willier) had committed the crime.

Dehus prefaced his testimony by in effect informing the court that he was no expert in mathematics and that the correlation that he would draw would be different from that used for paint statistics. The state objected to the question when Dehus testified that he had no solid statistical base from which he could draw the necessary statistics.

After the objection was sustained, defendant never proffered what exactly the witness would have testified, other than stating that the witness would have testified as to a "significant relationship" between the paint matches from the shroud and houses painted in Findlay, supposedly by Willier.

We find that since the question was asked on redirect examination and was not related to questions on cross-examination, exclusion on that ground would in any event have been within the sound discretion of the trial judge. See Evid. R. 611(A). Since we do not find that the trial court abused its discretion, we find this proposition of law to be not well-taken.

In his thirty-seventh proposition of law, defendant asserts that the trial court erred by excluding exculpatory testimony given by him at trial. We find, however, that the complained-of testimony is clearly hearsay under Evid. R. 802, and since it does not fall under any hearsay exceptions, the trial court properly excluded it.

The defendant attempted to testify as to what another person said about blood found in the bathtub of one of the suspects' trailers. Defendant testified that he asked a group of his friends how the blood got there. Upon his attempt to state his answer, the state objected, and such objection was sustained.

Defendant argues that the testimony would not have been hearsay, because it was not being offered to prove the truth of the matter asserted. However, we believe this explanation is without merit because if defendant could prove the truth of the matter

asserted in this context, it would support his defense theory that others had killed the victim. In addition, defendant submits that the statement would be a statement against interest and therefore admissible. However, in order to admit a statement against interest, it must be shown that the statement is trustworthy because of corroborating circumstances. Evid. R. 804(B)(3). The question whether corroborating circumstances are sufficient rests within the sole discretion of the trial court. State v. Landrum (1990), 53 Ohio St. 3d 107, 114, 559 N.E. 2d 710, 720. Defendant claims that the statement was trustworthy because it was said among his friends. Nevertheless, the trial court could properly conclude this to be insufficient corroborating circumstances. Accordingly, since defendant failed to establish that the statement fell under any hearsay exception, we find this proposition of law to be not well-taken.

Defendant, in his thirty-eighth proposition of law, contends that the trial court violated his right to compulsory process by prohibiting him from calling a witness.

The witness excluded was Clarence Mottinger, husband of the victim. The trial transcript reveals that he was called as a state witness and was cross-examined by defense counsel. After cross-examination, defense counsel asked the court to keep the witness available for recall. However, the court denied the request, based in all likelihood on the fact that the witness did not have any knowledge of the crime. In fact, Mr. Mottinger's testimony was basically limited to what kind of car his wife was driving when he last saw her, her clothing, and jewelry. Defendant asserts that the court's ruling was a denial of his right to compulsory process; however, we find that the court's ruling has nothing

to do with compulsory process. The recall of a witness is within the sound discretion of the trial court. Evid. R. 611(A).

Inasmuch as we find no abuse of discretion by the trial court in this vein, we overrule the foregoing proposition of law.

In his thirty-ninth proposition of law, defendant argues that he was denied a fair trial because the court refused to allow him to present surrebuttal testimony.

The testimony that defendant attempted to present was to the effect that one of the suspects, John Willier, did not cooperate with the defense during its investigation, and that certain oil tanks were closer to an exit than where one of the state's witnesses had stated they were. Apparently, defendant believes such testimony would corroborate his testimony that he went to a trailer park (where he claimed to have seen blood), that the trailer park was north of the Findlay exit, and that he noticed oil tanks at the exit.

Defendant contends that the court's decision was an abuse of discretion. The state cites Evid. R. 611(A) in arguing that the trial court reasonably exercised its discretion.

In our view, the court of appeals correctly found that the testimony was not surrebuttal evidence, since no testimony had been offered concerning Willier's cooperation. Cf. State v. Adams (1980), 62 Ohio St. 2d 151, 16 O.O. 3d 169, 404 N.E. 2d 144.

The denial of surrebuttal testimony by a criminal defendant lies solely within the discretion of the trial court. See State v. Moore (1973), 47 Ohio App. 2d 181, 188, 1 O.O. 3d 267, 271, 353 N.E. 2d 866, 873. A court does not, ipso facto, abuse its discretion in denying a criminal defendant the opportunity to present surrebuttal testimony.

We believe that even if the testimony in issue had been allowed, the outcome of the trial would not have been different. Assuming defendant could have proven that the tanks were where he said they were, such evidence would not have prevented the jury from finding him guilty of the crime. With regard to the assertion that Willier did not cooperate with defense counsel, testimony to that effect by itself would not overcome the other evidence of defendant's guilt. Such testimony would, at best, tend to point to the possible involvement of Willier which, by itself, does not relieve defendant of his culpability in committing the murder.

Accordingly, we find this proposition of law to be not well-taken.

In his fortieth proposition of law, defendant argues that the trial court erred by allowing postal inspector Hartman to give what defendant characterizes as irrelevant and inflammatory "guilt by association" testimony.

The subjects of this proposition are the many interviews that Hartman had with defendant. Specifically, the testimony of which defendant complains concerned: (1) violent acts against the victim; (2) defendant's involvement in the planning of contract killings; (3) his selection of a location for his associates to rob; (4) his participation in an attempt to rob a narcotics kingpin; and (5) his incarceration in the Kentucky State Penitentiary.

In order for this proposition of law to be sustained, there must be a finding of plain error. In order to find plain error under Crim. R. 52(B), a manifest miscarriage of justice must have occurred. *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804, paragraph three of the syllabus.

With respect to the proposed testimony concerning the violent acts against the victim, the testimony consisted of eyewitness testimony and admissions by defendant in which he stated that he witnessed the victim's rape and that he held her down when she was murdered.

Defendant argues that the admission of this testimony compelled the jury to find him guilty by association with the murderers. The jury evidently found that defendant was a participant in the murder of the victim, and his admissions to Hartman were also to that effect. Indeed, in one of his statements, defendant stated that he tackled the victim when she was trying to get away and that while he was on top of her, she was stabbed by one of his acquaintances. Defendant's argument of "guilt by association" cannot apply to this scenario because the testimony showed that he was a participant as much as the others in the acts he described that were perpetrated on the victim. We find that this testimony was highly relevant and was properly admitted by the trial court.

With respect to the contract killing testimony, we also find that this was admissible. Defendant told Hartman that, after the victim's body was disposed of in a bean field, "the dope man" wanted Rooster killed for talking too much. Defendant told Hartman that he and two of his associates decided to kill Rooster, that they drove him to an unknown location, and that one of his associates shot Rooster in the back with a nine millimeter round. This testimony is unmistakably a direct continuation of the abduction and murder of Mottinger.

In our view, this constituted relevant evidence. It is clear by defendant's own statements that he was involved. To say that this testimony was irrelevant would ignore its import.

The remaining instances cited by defendant all involve the killing of Rooster, except the one instance where defendant told Hartman that he had agreed to kill a person at the request of Gibson. This testimony was also relevant, however, in order to show the close relationship between defendant and Gibson, who was said to be seen outside the post office by Seibert just before the victim was discovered to be missing.

With respect to the testimony concerning requests to find places to rob, this appears to relate to Gibson, who asked defendant if he knew of any places he could rob. Gibson was said to have told the defendant that Clyde Cravens threw up after the knife penetrated the victim's body. In our view, this is also clearly relevant; it concerns a conversation in which Gibson stated that Cravens had to be taken care of quickly, because he talked too much about the murder.

With regard to the attempt to rob the alleged narcotics kingpin, we find this testimony was relevant since it concerned one of the alleged participants in the murder, Rooster. In one of the stories told by defendant to Hartman, Rooster was killed in a swamp where defendant and others were hiding because the men employed by the drug kingpin were searching for them after their failed attempt to steal the kingpin's drugs. Supposedly, the reason Rooster was killed was because he had a big mouth and talked too much about the many things they had done, including the killing of the victim.

With respect to the reference by Hartman to defendant's admission that he was in prison, we simply note defense counsel's opening statement that refers to defendant's prison record. Even if the court erred in not striking such testimony, we find it to be harmless beyond a reasonable doubt.

As the state points out, it is plain to see that without the defendant's statements to Hartman, it would have been difficult if not impossible to have linked defendant to the murder of Mottinger. The purpose of introducing the statements was not to demonstrate a propensity of the defendant to commit a violent crime, and that, therefore, the defendant was a likely person to have committed this murder. Rather, the purpose of introducing the evidence was to demonstrate the defendant's knowledge of the intimate facts of this case, facts that only someone who was directly involved would have or could have known.

We believe that each of the foregoing instances and admissions by defendant was relevant with regard to his participation in the crimes and his knowledge of the circumstances both during and after the crimes were committed, as well as the measures taken by some of the participants to cover up and to eliminate witnesses. We find that the trial court did not abuse its discretion in admitting such testimony. Accordingly, this proposition of law is not well-taken.

In his forty-first proposition of law, defendant claims that the trial court erred by admitting evidence of uncharged misconduct and other crimes that inflamed the jury and prejudiced him. Defendant asserts that the admission of such evidence violated Evid. R. 404(B). The testimony complained of was admitted without objection and was given by Ruffin, Connors, Smith and Billy Ashley, a corrections officer at the Kentucky State Penitentiary.

In our opinion, the testimony provided by all four witnesses was relevant and probative, for varying reasons. Ruffin's testimony concern-

ing defendant's attempted escape from jail and subsequent threats demonstrated Ruffin's knowledge of defendant's actions and that defendant confided in Ruffin concerning the details of the murder of the victim. In sum, Ruffin's testimony was relevant and admissible under Evid. R. 401. Connors' testimony was also relevant and probative in showing that defendant confided details of the murder to another person.

Defendant's argument that Smith's "other acts" testimony elicited by the state was prejudicial would be stronger were it not for the fact that defense counsel's opening statements initially drew attention to this attempted escape from jail. In addition, it was defense counsel who brought up the alleged jewelry theft by defendant. Under such circumstances, we cannot find this testimony to be prejudicial.

With respect to Ashley's testimony, we believe it was relevant to and probative of the entire factual scenario underlying the cause *sub judice.* Ashley merely corroborated the other testimony at trial that defendant and Gibson could be seen together since they were former cellmates at the Kentucky prison.

In sum, the testimony of all four witnesses was relevant, probative and did not prevent defendant from receiving a fair trial. Accordingly, we overrule this proposition of law.

In his forty-second proposition of law, defendant contends he was denied a fair trial based on the court's failure to exclude blatant hearsay testimony.

The testimony complained of here was given by postal inspector Strausbaugh and was admitted without objection. Strausbaugh testified that at a photo array session, Seibert identified and described Gibson, the accomplice of defendant, as being in front of the post office at the time the victim was kidnapped. However, Seibert testified immediately after Strausbaugh and essentially corroborated his testimony.

While the testimony of Strausbaugh was inadmissible hearsay and should have been excluded, it did not constitute prejudicial error since Seibert was available for cross-examination, and did in fact testify later as to her identification of Gibson. As such, we find that defendant has failed to show plain error. Accordingly, this proposition of law is overruled.

In his forty-third proposition of law, defendant argues that the trial court erred by admitting a handgun into evidence without proper authentication. In particular, defendant claims that the trial court committed error by admitting into evidence a .357 magnum revolver with wood textured handles that was found in the possession of Gibson. The defendant argues that since it was not identical to the gun described by the defendant, it was irrelevant and, therefore, should have been excluded.

During the course of the investigative interviews postal inspector Hartman conducted with the defendant, the defendant described a .357 revolver with ivory handles that was shown to him by Gibson, after defendant got out of prison. However, we find defendant's statement about the gun was relevant to this case because it clearly supports the proposition that the defendant was in the company of his ex-cellmate (Gibson) around the time that the victim was kidnapped and murdered. As noted by the court of appeals below, while no proper foundation was laid in order to justify the admission of the handgun, such admission was harmless beyond a reasonable doubt pursuant to Crim. R. 52(A).

Therefore, we find this proposition of law to be not well-taken.

In his forty-fourth proposition of law, defendant contends that the trial court erred in the admission of a purse and in the admission of sympathetic testimony of family relationships of the victim.

The record indicates that while defendant was being interviewed by the postal authorities, he described the victim's purse as being cream-colored with loop handles, and with dimensions of approximately eighteen by twenty-four inches. The purse was never recovered; however, the former daughter-in-law of the victim testified that she and the victim had purchased nearly identical purses while shopping the Saturday before the victim was kidnapped. The victim's daughter also testified regarding the purse. Without objection, the purse of the former daughter-in-law was admitted into evidence in order to show that the description of the purse that defendant gave Hartman was the same as the description of the victim's missing purse.

The state asserts that the description of the stolen purse was never disclosed to the public, and that defendant's knowledge and description of the purse put him squarely at the scene of the crime.

In our view, admission of the purse into evidence was not erroneous since it was relevant demonstrative evidence for the jury to consider. In addition, there was no error established, let alone plain error, in admitting the testimony of the victim's former daughter-in-law concerning her close relationship with the victim. Accordingly, we reject the foregoing proposition of law.

In his forty-fifth proposition of law, defendant asserts that the trial court erred in admitting a ring into evidence without proper authentication.

In actuality, two rings were introduced into evidence. One was the actual ring worn by the victim and removed from her body by the investigators. The other ring was an exact replica of the victim's ring and was used to show what the original ring looked like, since the original ring had deteriorated on account of its contact with the victim's decomposing body.

Here, defendant did not object to the admission of either ring and, in our view, he has failed to show plain error in this context. In addition, the evidence of the ring was never disclosed to the public, yet defendant told of the ring with the stone removed in one of his interviews with postal inspector Hartman. Accordingly, we find that the rings were relevant evidence under Evid. R. 401 and were properly identified and authenticated under Evid. R. 901. Therefore, we find this proposition of law to be without merit.

In his forty-sixth proposition of law, defendant submits that the trial court erred in admitting into evidence a model of the shroud that was found wrapped around the victim. We find, however, that the shroud model, which was not objected to by defendant, was relevant and that the court did not err in admitting it.

During an interview with postal inspector Hartman, defendant stated that the victim's body had been wrapped in a curtain end over end, head over heels, as opposed to a side to side manner. When the victim's body was discovered, it was wrapped in the same manner as described by defendant. The manner in which the victim's body was wrapped had not been disclosed to the public.

The shroud model was used as demonstrative evidence of the original shroud, which had an offensive odor to

it. The shroud model permitted the state to show how the body was wrapped, in comparison with defendant's description to Hartman. Accordingly, we overrule this proposition of law.

In his forty-seventh proposition of law, defendant argues that the trial court erred in failing to exclude certain hearsay testimony of Detective Eversole. The allegations here concern Eversole's testimony relating to statements and a photospread identification made by Lewis.

While the testimony in issue was erroneously admitted since it was hearsay, Lewis later testified the same day as Eversole, and was thoroughly cross-examined by defense counsel. Therefore, the error was rendered harmless beyond a reasonable doubt, and this proposition of law is overruled.

In his forty-eighth proposition of law, defendant asserts that the trial court erred in admitting into evidence inflammatory and gruesome photographs of the victim.

Since the photos were eventually admitted without objection, plain error must be shown in order to sustain this proposition of law. However, in our view, the photos complained of are not gruesome; they are of the body of the victim wrapped in a shroud, and the victim's body cannot be seen. The photos were taken from various angles and supported testimony of the law enforcement officers and statements of defendant in his interview with Hartman describing the manner in which the victim's body had been wrapped in the shroud. As this court stated in *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 281, 528 N.E. 2d 542, 550, that "[t]he term 'gruesome' in the context of photographic evidence should, in most cases, be limited to depiction of actual bodies or body parts." Even

assuming, *arguendo,* that some of the photos are gruesome, we find that the photos were admissible under the standard articulated in *Maurer, supra,* paragraph seven of the syllabus. See, also, *State* v. *Benner* (1988), 40 Ohio St. 3d 301, 311-312, 533 N.E. 2d 701, 712-713. Accordingly, since error is absent, we overrule this proposition of law.

In his forty-ninth proposition of law, defendant contends that the trial court erred by improperly instructing the jury on the lesser included offense of murder, where a complete defense to the charges was offered.

In this proposition, defendant appears to be saying that since he did not present evidence as to the lesser included charge of murder, the court is precluded from instructing the jury on it. However, we find that the court is clearly permitted to charge on a lesser included offense if "* * * the trier of fact could reasonably find against the state and for the accused upon one or more of the elements of the crime charged, and for the state and against the accused on the remaining elements, which, by themselves, would sustain a conviction upon a lesser included offense." *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 388, 18 O.O. 3d 528, 532, 415 N.E. 2d 303, 308.

The issue presented here is simply whether the jury could have found defendant guilty of the lesser included charge of murder, which would require a finding that the death was purposely caused, but without prior calculation and design. Under the facts of this case, we believe that the jury could have so found, and that, therefore, this proposition of law is not well-taken.

In his fiftieth proposition of law, defendant asserts that the trial court erred during the penalty phase of trial by giving a vague instruction on the weighing process of the aggravating

circumstances and mitigating factors required by R.C. 2929.03(D)(2).

The jury instructions relevant to this issue were approved by defense counsel prior to being read to the jury, and there was no objection lodged. Thus, for defendant to prevail on this argument, a finding of plain error is required. Crim. R. 30(A) states in relevant part:

"* * * A party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. * * *"

Any failure to object to a jury instruction at the time of trial constitutes a waiver. *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 100, 26 OBR 79, 85-86, 497 N.E. 2d 55, 62. Since defendant failed to object, and thus comply with Crim. R. 30(A), he must establish that the instruction amounted to plain error. *Id.* at 100, 26 OBR at 86, 497 N.E. 2d at 62.

In this case, the jury was instructed as follows: "The Prosecutor has the burden to prove beyond a reasonable doubt, that the aggravating circumstances of which the Defendant was found guilty outweigh the factors in mitigation of imposing the death sentence. To outweigh means to weigh more than; to be more important than. The existence of mitigating factors does not preclude or prevent the death sentence, if the aggravating circumstances outweigh the mitigating factors.

"You are bound by law, and by your oath as jurors, to consider mitigating factors. You may only recommend a sentence of death if you unanimously find, beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors.

"You should not limit your consideration of mitigation to the enumerated statutory factors. You may also consider any other circumstances relating to this case which in fairness and mercy to John George Spirko, Jr. may be reasons for not imposing the death penalty."

Defendant argues that since the court did not define the words "more important" and did not show how the term "would figure in the weighing process," the instruction was inadequate.

We disagree, and hold that the above instruction adequately includes all the necessary factors to be considered by the jury under R.C. 2929.03. Accordingly, since error is absent in this context, this proposition of law is found to be not well-taken.

In his fifty-first proposition of law, defendant contends that he was deprived of a fair trial because the trial court charged the jury as to four mitigating factors during the penalty phase, whereas the defendant maintains that only two mitigating factors were present.

However, it appears that defense counsel agreed that the court could charge the jury on four mitigating factors.[10] Thus, it is difficult to see how

---

[10] The mitigating factors charged by the jury from R.C. 2929.04(B) were as follows:

"* * *

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of commit-

ting the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"* * *

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's par-

defendant was prejudiced by the court's instruction. Nevertheless, even if there had not been an agreement by defense counsel, this court has previously held that mentioning all mitigating factors to the jury does not constitute prejudicial error, even if such factors were not presented by defendant. *DePew, supra,* at 289-290, 528 N.E. 2d at 558.

In any event, we do not believe that this jury instruction constitutes plain error. Accordingly, we reject this proposition of law advanced by defendant.

In his fifty-second proposition of law, defendant assails the trial court's charge to the jury during the penalty phase that it could consider any factor it desired in determining the penalty to be given defendant. However, we find that the charge complained of completely complied with R.C. 2929.04 (B)(7). (See footnote 10, *supra*.) Since such instruction was rendered in accordance with Ohio law and was not erroneous or prejudicial, we overrule this proposition of law.

In his fifty-third proposition of law, defendant contends that the charge to the jury on venue created an erroneous conclusive presumption that relieved the state of its burden to prove such a material fact. We disagree, because we find that the charge on venue complied with R.C. 2901.12. In addition, defendant did not object to such instruction pursuant to Crim. R. 30. Since defendant has failed to demonstrate prejudicial error in this vein, we overrule this proposition of law.

In his fifty-fourth proposition of law, defendant argues that the jury instruction requiring unanimity for a life verdict is unconstitutional.

This court has already found this argument to be unmeritorious. See *State* v. *Jenkins, supra,* at 213-214, 15 OBR at 353-354, 473 N.E. 2d at 306-307. Accordingly, this proposition of law is summarily overruled.

In his fifty-fifth proposition of law, defendant contends that the trial court's and prosecutor's statements to the jury that its sentencing verdict would be only a recommendation violated both the state and federal Constitutions.

This issue has been addressed many times before by this court and has been repeatedly rejected. See, *e.g., State* v. *Buell* (1986), 22 Ohio St. 3d 124, 144, 22 OBR 203, 220, 489 N.E. 2d 795, 812-813. Since defendant has presented no persuasive argument that would compel a change in our viewpoint, we find this proposition of law to be devoid of merit.

In his fifty-sixth proposition of law, defendant submits that the death qualification of the jury, *i.e.,* permitting dismissal of prospective jurors who are opposed to the death penalty, violated his constitutional rights to equal protection of law. However, this procedure has already been found to be constitutional by this court. *Jenkins, supra.* Therefore, we summarily reject this proposition of law.

In his fifty-seventh proposition of law, defendant argues that Ohio's statutory provisions for the imposition of the death penalty are unconstitutional. However, we have previously held that such statutory procedures are indeed constitutional. See *Jenkins, supra,* paragraph one of the syllabus. Accordingly, we overrule this proposition of law.

In his fifty-eighth proposition of law, defendant contends that the

---

ticipation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

utilization of voter rolls for the selection of jurors does not achieve a fair cross section of certain groups in the special venire, and is therefore unconstitutional. However, this court has consistently ruled that such method of selecting prospective jurors is constitutional. See *State* v. *Johnson* (1972), 31 Ohio St. 2d 106, 60 O.O. 2d 85, 285 N.E. 2d 751, paragraph two of the syllabus. Since we believe the procedures used in the cause *sub judice* are constitutional, we find this proposition of law to be without merit.

In his fifty-ninth proposition of law, defendant argues that the trial court's refusal to permit the defense examination of Willier as on cross-examination constituted an abuse of discretion which deprived him of a fair trial.

Willier was called to testify during the defense case-in-chief, and defendant requested that the court permit questioning as on cross-examination of a hostile witness. The court then stated that it would reserve its ruling until such time as the witness proved to be hostile. The trial court however did not find that the witness became hostile, and we concur in such assessment. Evid. R. 611 gives a court the discretion to control the form of questions. Here, we do not find any abuse of discretion by the trial court, after a careful review of the record. In addition, there was no proffer of the leading questions defendant wished to ask but was prevented from asking by the trial court. See Evid. R. 103(A)(2). Accordingly, we find this proposition of law to be without merit.

In his sixtieth and final proposition of law, defendant argues that the proportionality review required by R.C. 2929.05 is unconstitutional under the Due Process Clauses of the state and federal Constitutions. Once again, this argument has been made before and

rejected by this court. See *Jenkins, supra,* paragraph one of the syllabus. Accordingly, we summarily overrule defendant's final proposition of law.

Having reviewed the various and numerous propositions of law raised by defendant, and having found none of them to be meritorious, we next turn to our responsibility of independently weighing the aggravating circumstances against the mitigating factor(s) of the case.

In so doing, we review the testimony in the record, and note that defendant himself was the only witness who testified at the mitigation hearing. Defendant made his statement under oath, and conveyed the feeling that he had been given a fair trial. Defendant stated that his life had been "one prison to the next, just constantly prison, prison, prison," and that he had turned into a person that he did not like. Defendant maintained several times that he had not kidnapped or killed Mottinger, but that he deserved to be put to death nonetheless since he had done enough in his lifetime to be executed three or four times.

Over defendant's objection, his counsel offered in mitigation a psychiatric report conducted by Dr. Hubert T. Goodman, Jr. In his report, Goodman concluded in relevant part as follows:

"It is evident to me that Mr. John Spirko, Jr. was the product of a home of extreme violence. He was reared by a violently abusive, drunken father who beat and abused him and a mother who was unable to protect him. From this, young John readily learned that closeness to others was dangerous and that even parents could not be trusted to love and nurture. He learned that it was violence, anger and distrust of others that represented the power of life, rather than love and understanding. These areas of thinking and be-

havior grew and became more manifest as he grew older. The distrust became a more continuing suspiciousness of others towards which he felt compelled to react with his impulsive, hostile approach.

"* * *

"It is my opinion that Mr. Spirko is manifesting a Borderline Personality Disorder which is a mental illness. Mr. Spirko manifests the characteristic desire to be viewed in a positive light, while at the same time committing acts that would cause him to be viewed in exactly the opposite way; a disturbed relationship with others as exemplified by his manipulations and his use of them; self-damaging tendencies which included not only a suicide attempt but also taking unnecessary risks to enhance the image of himself; a tendency to be damaging to others as seen in his involvement in selling drugs, fighting and injuring others; a proneness to readily develop mood swings marked by grandiose, bragging, as well as periods of depression; a tendency to have disturbed thoughts, suspiciousness and periodic bursts of paranoid psychotic thinking during which time he would become impulsive with violent acts; and a proneness to become easily bored with life.

"* * *

"It is my opinion that any violent crimes that Mr. Spirko may have committed would have been performed while he was in a depressed, suspicious state during which times, periods of psychotic thinking would have been likely.

"It is my opinion that the existence of the various facets of Mr. Spirko's mental illness would have reduced his capacity to conform his conduct to that of law for any violent act or acts that he may have committed and serves as a mitigating circumstance in this matter."

With respect to the enumerated mitigating factors set forth in R.C. 2929.04(B)(1) through (6), we find that defendant's evidence arguably satisfies only number three, *i.e.,* that because of a mental disease or defect defendant lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The evidence for any other factor which could possibly be present in this cause is so scant that it would be entitled to virtually no weight at all.

In our view, factor three is deserving of some weight, especially in light of the examination conducted and reported by Goodman.

On the other hand, we note the aggravating circumstances of this case: that the murder was committed for the purpose of escaping detection, apprehension, trial or punishment for the kidnapping (R.C. 2929.04[A][3]); and that defendant had a prior murder conviction in Kentucky (R.C. 2929.04 [A][5]).

Upon a careful consideration of the foregoing, we find that the aggravating circumstances reviewed outweigh the mitigating factor beyond a reasonable doubt; and, therefore, we find that the death sentence rendered herein was appropriate.

Finally, this court must decide whether the sentence of death imposed here is excessive or disproportionate to the sentence in similar cases. We hold that the death sentence is proportionate to the sentence approved for kidnap-murder in *Maurer, supra.* Accordingly, we agree with the court of appeals that the penalty imposed here is entirely appropriate.

In conclusion, we first find that there is no merit to any of the specific propositions of law raised by defendant that would compel a reversal of his conviction of murder. Second, we

find that the aggravating circumstances outweigh the mitigating factor presented, beyond a reasonable doubt. Third, we find the sentence of death to be appropriate in this case, as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Therefore, in accordance with R.C. 2929.05(A), we affirm the convictions and sentence of death in this cause.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., HOLMES, DOUGLAS and RESNICK, JJ., concur.

WRIGHT and H. BROWN, JJ., concur in judgment only.